J-S59025-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA

Appellee

v.

LINDELL TATE

Appellant

IN THE SUPERIOR COURT OF
PENNSYLVANIA

No. 3368 EDA 2013

Appeal from the Judgment of Sentence May 3, 2012
In the Court of Common Pleas of Bucks County
Criminal Division at No(s): CP-09-CR-0003146-2011

BEFORE:  SHOGAN, J., LAZARUS, J., and STRASSBURGER, J.[*]

MEMORANDUM BY LAZARUS, J.:               **FILED SEPTEMBER 26, 2014**

Lindell Tate appeals from his judgment of sentence, entered in the
Court of Common Pleas of Bucks County, following Tate's convictions for
robbery – threat of immediate serious injury,[1] receiving stolen property,[2]
firearms not to be carried without a license,[3] possession of a weapon,[4]
recklessly endangering another person,[5] theft by unlawful taking – movable

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. § 3701(a)(1)(ii).

[2] 18 Pa.C.S. § 3925(a).

[3] 18 Pa.C.S. § 6106(a).

[4] 18 Pa.C.S. § 907(b).

[5] 18 Pa.C.S. § 2705.

property,[6] and persons not to possess, use, manufacture, control, sell or transfer firearms.[7] Tate's counsel also moves to withdraw pursuant to the dictates of **Anders v. California**, 386 U.S. 738 (1967), **Commonwealth v. McClendon**, 434 A.2d 1185 (Pa. 1981), and **Commonwealth v. Santiago**, 978 A.2d 349 (Pa. 2009). Upon review, we affirm Tate's judgment of sentence based on the opinion of the Honorable Clyde W. Waite, and grant counsel's petition to withdraw.

On January 29, 2011, at approximately 6:05 p.m., Tate entered a 7-Eleven store at Street Road and Windsor Street in Bensalem Township, Bucks County. Tate pointed a handgun at the store clerk and demanded money and cigarettes. The clerk gave Tate cigarettes and $635.00 in cash. Tate then fled to the Dunkin' Donuts across the street. Meanwhile, the store clerk and another 7-Eleven employee called 911. The call resulted in a police radio dispatch describing Tate and stating that he had run across Street Road to a Dunkin' Donuts store.

Officer Steven Bailey of the Bensalem Township Police responded to the call along with three other officers. They entered the Dunkin' Donuts where they saw a man matching Tate's description go into the bathroom. Officer Bailey requested three times that Tate come out. Tate ignored these

_____

[6] 18 Pa.C.S. § 3921(a).

[7] 18 Pa.C.S. § 6105(a)(1).

- 2 -

requests, and Officer Bailey entered the bathroom. Officer Bailey confronted Tate in the bathroom and again asked him to leave, however, Tate refused. The other officers then entered the bathroom, and following a brief struggle, they detained and arrested Tate.

At the time of his arrest, Tate had $615.00 on his person. Investigation revealed that Tate purchased a cup of Dunkin' Donuts coffee using a $20 bill he had stolen from 7-Eleven. A search of the bathroom revealed a black nine-millimeter Taurus handgun in the wastebasket. Later testing of the weapon revealed it was covered in DNA matching Tate's.

Following his arrest, Bensalem Township Detective David Nieves interviewed Tate. After obtaining identifying information, Detective Nieves read Tate his *Miranda*[8] warnings and Tate read and signed a card with the warnings, indicating he understood each one. After first denying guilt, Tate confessed to robbing the 7-Eleven. Tate later testified at the suppression hearing that he was high during his interview; however, Detective Nieves testified that Tate appeared normal, coherent, and understanding.

On August 19, 2011, Tate filed an omnibus pre-trial motion seeking to suppress all evidence obtained subsequent to his arrest. Following a suppression hearing on August 30, 2011, the court concluded that the police

---

[8] *Miranda v. Arizona*, 384 U.S. 436 (1966).

had sufficient probable cause to arrest Tate immediately after the robbery and denied his pre-trial motion.

On March 6, 2012, a one-day stipulated waiver trial occurred. At the conclusion of trial, the court found Tate guilty on all counts. Sentencing was deferred until May 3, 2012, at which the time the court sentenced Tate to an aggregate term of 7½ to 17 years' incarceration.

Tate filed a motion for reconsideration of sentence on May 7, 2012, which was denied by operation of law. On December 2, 2013, following reinstatement of his right to appeal *nunc pro tunc*, Tate filed the instant appeal.

As noted above, counsel has filed an *Anders* brief and a corresponding petition to withdraw as counsel. "When faced with a purported *Anders* brief, this Court may not review the merits of the underlying issues without first passing on the request to withdraw." *Commonwealth v. Rojas*, 874 A.2d 638, 639 (Pa. Super. 2005). Furthermore, counsel must follow certain mandates when seeking to withdraw pursuant to *Anders*, *McClendon*, and *Santiago*. These mandates are not overly burdensome and have been summarized as follows:

> Direct appeal counsel seeking to withdraw under *Anders* must file a petition averring that, after a conscientious examination of the record, counsel finds the appeal to be wholly frivolous. Counsel must also file an *Anders* brief setting forth issues that might arguably support the appeal along with any other issues necessary for the effective appellate presentation thereof.
>
> *Anders* counsel must also provide a copy of the *Anders* petition and brief to the appellant, advising the appellant of the right to

retain new counsel, proceed *pro se* or raise any additional points worthy of this Court's attention.

If counsel does not fulfill the aforesaid technical requirements of ***Anders***, this Court will deny the petition to withdraw and remand the case with appropriate instructions (e.g., directing counsel either to comply with ***Anders*** or file an advocate's brief on Appellant's behalf).

***Commonwealth v. Woods***, 939 A.2d 896, 898 (Pa. Super. 2007) (citations omitted).

Moreover, the ***Anders*** brief that accompanies counsel's petition to withdraw must:

(1) provide a summary of the procedural history and facts, with citations to the record; (2) refer to anything in the record that counsel believes arguably supports the appeal; (3) set forth counsel's conclusion that the appeal is frivolous; and (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

***Santiago***, 978 A.2d at 361.

Here, counsel filed a petition averring that, upon a thorough examination of the record, he finds the appeal to be wholly frivolous, and states his reasons for so concluding. Counsel also filed a brief that provides the case's factual and procedural history and includes citations to the record. Counsel provided a copy of the ***Anders*** petition and brief to Tate, and advised him of his right to retain new counsel, or proceed *pro se*, and raise any additional points he deems worthy of this Court's attention. Accordingly, we find counsel has met the requirements of ***Anders***, ***McClendon***, and ***Santiago***.

Once counsel has satisfied the above requirements, this Court conducts its own review of the proceedings and renders an independent judgment as to whether the appeal is, in fact, wholly frivolous. *Commonwealth v. Wright*, 846 A.2d 730, 736 (Pa. Super. 2004). On appeal, Tate challenges the trial court's decision to deny his motion to suppress all evidence obtained subsequent to his arrest, claiming that the police lacked reasonable suspicion, probable cause, or any other grounds to detain, search, and arrest Tate. Accordingly, Tate argues that all evidence obtained as a result of his arrest should have been suppressed.

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the trial court, we conclude that Tate's challenge to the trial court's denial of his suppression motion is meritless. The trial court opinion comprehensively discusses and properly disposes of the question presented. *See* Trial Court Opinion, 4/14//14, at 14-17 (finding "[a]n examination of the totality of the circumstances surrounding this case reveals that there was an overwhelming amount of indisputable evidence to support the trial court's conclusion that the police officers had probable cause to detain and arrest Tate.").

As such, we rely upon the opinion authored by the Honorable Clyde W. Waite in affirming the trial court's order. We instruct the parties to attach a copy of Judge Waite's decision in the event of further proceedings in the matter. Additionally, because Tate's appeal is, in fact, wholly frivolous, we grant counsel's petition to withdraw.

Judgment of sentence affirmed. Petition to withdraw as counsel granted.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/26/2014

IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY, PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA : No. 3146 of 2011
:
v. :
:
LINDELL TATE :
:

## OPINION

Appellant Lindell Tate ("Tate") was arrested and charged on Criminal Information 3146-2011 with one count each of Robbery – Threat of Immediate Serious Injury, 18 Pa.C.S. § 3701(a)(1)(ii); Receiving Stolen Property, 18 Pa.C.S. § 3925(a); Firearms Not to be Carried Without a License, 18 P.S. § 6106(a)(1); Possession of Weapon, 18 P.S. § 907(b); Recklessly Endangering Another Person, 18 P.S. § 2705; Theft by Unlawful Taking – Movable Property, 18 Pa.C.S. § 3921(a); and Persons Not to Possess, Use, Manufacture, Control, Sell or Transfer Firearms, 18 P.S. § 6105(a)(1).

On February 11, 2011, Tate filed a Motion for Line-up to which the Commonwealth filed its response on March 18, 2011. After a hearing on May 3, 2011, the Honorable Jeffrey L. Finley of this Court denied Tate's request for a line-up.

On August 19, 2011, Tate filed an Omnibus Pre-trial Motion seeking to suppress all evidence obtained subsequent to his apprehension by the police.

After a Suppression Hearing was held on August 30, 2011, at which Tate initially made and then withdrew a request for replacement of his public defender due to "irreconcilable differences," the Honorable Diane E. Gibbons of this Court concluded that the police clearly had

sufficient probable cause to arrest Tate immediately after the robbery, and denied Tate's Omnibus Pretrial Motion.

On September 27, 2011, Tate filed *pro se* a "Petition for writ of Habeas Corpus for 5:3 Motion for dismissal of charges."

On November 30, 2011, the Bucks County Public Defender's Office filed a Petition for Appointment of Private Counsel after they became aware that Tate had filed a complaint against them with the Disciplinary Board. On December 2, 2011, this Court granted that Petition and appointed new defense counsel to represent Tate.

On December 5, 2011, Tate again filed *pro se* the "Petition for writ of Habeas Corpus for 5:3 'Motion for dismissal of charges,' " and he also filed a "Motion in limine with Respect to Money Seized From Defendant" and a "Motion for Waiver/Modification of Pa.R.Crim.P. 576(4) Relating to Defendants Represented by Counsel of Record." These motions were returned to the file for consideration at time set for trial.

On March 6, 2012, this Court conducted a one-day stipulated waiver trial. Because Tate had initially requested a trial by jury, we granted his pre-trial Motion for Severance of Count 7 (Persons Not to Possess, Use, Manufacture, Control, Sell or Transfer Firearms). Next, after accepting incorporation of the records from Tate's Preliminary and Suppression Hearings, we denied Tate's pre-trial motions including the Motion for Habeas Corpus Dismissal of Charges, the Rule 600 Motion to Dismiss, and the Motion to Suppress Defendant's Statement to Detective Nieves. Tate then withdrew his remaining Motion in Limine to Exclude Monetary Evidence Seized. Upon returning from a recess to allow counsel to review the jury questionnaires, this Court was informed that Tate had consulted with his counsel and "agreed to have this Court hear this case as a stipulated waiver trial." We then granted the request to hear all seven Counts,

2

including Count 7, at this waiver trial, and we incorporated the record from the Suppression Hearing held before Judge Gibbons on August 30, 2011, into these trial proceedings. At the conclusion of this trial we found Tate guilty upon all Counts.

On May 3, 2012, this Court sentenced Tate upon Count 1, Robbery - Threat of Immediate Serious Injury, to pay the costs of prosecution and undergo imprisonment in a State Correctional Facility for not less than seven and a half (7 ½) nor more than seventeen (17) years. On Count 4, Possession of a Weapon, this Court ordered Tate to pay the costs of prosecution and undergo imprisonment in a State Correctional Facility for not less than one (1) nor more than two (2) years. The sentences were to be served concurrently. No further penalties were imposed upon the remaining Counts.

On May 7, 2012, Tate filed a Motion for Reconsideration of Sentence.

On May 21, 2012, this Court issued an Order granting Tate's Motion for Appointment of Appellate Counsel.

On September 18, 2012, this Court held a hearing on Tate's Motion for Reconsideration of Sentence. At the conclusion of that hearing, we advised counsel that we would continue the hearing in order to permit counsel to investigate potential resolutions to Tate's request for deferral of the costs imposed at sentencing in order to pursue educational opportunities while incarcerated.

On March 20, 2013, Tate submitted correspondence expressing his displeasure with his appellate counsel.

On May 15, 2013, Tate filed *pro se* a Motion for Post-Conviction Collateral Relief.

On September 10, 2013, this Court issued an Order granting Tate's request for the appointment of new appellate counsel.

On September 19, 2013, Tate's new appellate counsel filed a Motion for Transcripts. On September 30, 2013, this Court issued an Order granting Tate's Motion for Production of Transcripts and Other Related Documents.

On October 18, 2013, Tate's new appellate counsel filed a Motion to Amend Defendant's PCRA Petition.

On October 30, 2013, this Court issued an Order granting Tate's Motion to Amend his PCRA Petition and reinstating his right to file a direct appeal.

On December 2, 2013, Tate filed a Notice of Appeal to the Superior Court of Pennsylvania from this Court's Order of May 3, 2012, imposing sentence.

On December 3, 2013, this Court ordered Tate to file a Statement of Errors Complained of on Appeal no later than twenty one (21) days from the date of the Order pursuant to Pa.R.A.P. 1925(b).

On December 20, 2013, Tate filed a "Motion to Extend Time for Filing Statement Under Pa.R.App.Pro. 1925(b)" because of the unavailability of the Notes of Testimony. By Orders docketed on January 2, 2014 and January 15, 2014, this Court granted Tate's request and extended the time to file his Statement of Errors Complained of on Appeal to February 2, 2014.

On February 3, 2014, Tate filed another "Motion to Extend Time for Filing Statement Under Pa.R.App.Pro. 1925(b)," again asserting that the Notes of Testimony had not yet been prepared. On February 7, 2014, this Court denied Tate's request to extend the time for filing the Statement of Errors.

On March 6, 2014, Tate filed a "Defendant's Statement Pursuant to Pa.R.App.Pro. 1925(b)." On that date Tate also filed a "Motion Pursuant to Pa.R.App.Pro. 1926 to Supplement the Record" which requested the incorporation of the copies he had attached of the transcripts

4

from the March 6, 2012 and May 3, 2012 hearings that he had received via e-mail from the Court stenographer.

On March 13, 2013, the Superior Court of Pennsylvania issued an Order permitting Tate "to file with the trial court and serve upon the trial judge a statement of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(b), within twenty-one (21) days of the date of that this Order is filed." In addition, the trial judge was directed to "prepare an opinion, pursuant to Pa.R.A.P. 1925(a), in response to the Rule 1925(b) statement, within thirty (30) days of the date the statement is received."

On March 14, 2014, this Court issued an Order granting Tate's Motion to Supplement the Record.

On March 17, 2014, Tate submitted his "Defendant's Statement Pursuant to Pa.R.App.Pro. 1925(b) Submitted Pursuant to the March 11, 2014 Order of the Superior Court Allowing the Defendant to Submit a Statement Pursuant to Pa.R.App.Pro. 1925(b)."

This Opinion is filed pursuant to Pa.R.A.P. 1925(a).

FACTUAL BACKGROUND

Viewing the evidence in the light most favorable to the Commonwealth as verdict winner, the following findings of fact and conclusions of law were placed of record at the end of the Suppression Hearing held before Judge Gibbons on August 30, 2011, which as noted above was incorporated into the trial record:

Officer Steven Bailey, as a police officer with the Bensalem Township Police Department, on January 29th of 2011, [ ] was on patrol on duty at approximately 6:05 p.m. He was in uniform, in a marked patrol vehicle. [ ] at 6:05 p.m. on Saturday he was dispatched to Street Road and Kingston Way for a robbery of a 7-Eleven at that location. On route he was advised further by dispatch that the actor was running towards or running to the Dunkin' Donuts

5

which is located across the street on Street Road also in Bensalem Township, Bucks County.

He arrived at the Dunkin' Donuts location two minutes after the original dispatch. For the record, the officer testified that he was originally dispatched at 6:05 and arrived at the Dunkin' Donuts at 6:07. The officer responded ... in a marked patrol vehicle with lights and sirens.

Upon his arrival he spoke with a male subject who asked the officer whether he was looking for a black male dressed in black. The officer responded that he did and he was told by the unidentified male that that person was inside the Dunkin' Donuts. On route the officer had a description of the individual that he was seeking for the 7-Eleven robbery and that was based on information he received from Bucks County Police Radio. Bucks County Police radio indicated that there was a black male, thin, approximately five-ten, wearing a black jacket, black hooded sweat shirt and jeans. The jeans -- the color of the jeans was not specified.

... Dunkin' Donuts is a business that faces Street Road. It has a glass front. The officer pulled in approximately 15 feet from the glass door front, was able to see into the Dunkin' Donuts and observed a black male matching the description of the perpetrator of the robbery of the 7-Eleven. There was only one black male in the Dunkin' Donuts at the time. That individual was walking back towards the bathroom which is on the right side of the Dunkin' Donuts. The officer had an unobstructed view as a result of the glass front and there was nothing else apparently obstructing his view.

The officer radioed to other police officers in the area indicating that he was at the Dunkin' Donuts. ... Officer Bailey entered into the Dunkin' Donuts and went back to the area of the bathroom. He was accompanied by two other police officers from Bensalem Township Police Department. Those two officers were also in full uniform. The bathroom door to the facility was closed. The officer asked the individual to come out of the bathroom; the defendant did not come out of the bathroom. The door was opened by the police. The defendant was seen standing in the middle of the bathroom. He was asked to come out and show his hands on three separate occasions. The defendant ignored the verbal commands of the police officer. The two officers with Officer Bailey had their guns drawn at this time. The defendant was then physically removed from the bathroom by the police and began to struggle with the officers, after a short struggle described as a 30-second struggle with the three Bensalem Township Police officers, the was detained, he was put on the floor and was handcuffed. He was then removed from the Dunkin' Donuts.

Prior to his being removed and while he was still in the Dunkin' Donuts on the floor handcuffed, one of the officers, Officer Jackson, went into the bathroom and advised Officer Bailey that he had observed a black nine-millimeter Taurus handgun in the trash can located in the bathroom inside the Dunkin' Donuts.

At the time the defendant was initially observed inside the Dunkin' Donuts he matched the description, specifically he had on a black leather jacket, a

black hoodie underneath the jacket, and was observed with money in his front pants pocket.

After being removed from the bathroom there was a pat-down search for weapons and nothing was found on the defendant's person in terms of ... a weapon.

The defendant was ultimately taken out of the store and placed in the police car. He was ultimately searched and was found to be in possession of $615, some was in his pants pocket, some was in his jacket. The money that was retrieved from the ... defendant was wrapped in money wrappers by denomination.

A 7-Eleven store employee was brought to the Dunkin' Donuts parking lot by Bensalem Township Police, that clerk identified the defendant as the individual who had committed the burglary at the 7-Eleven on the evening of January 29, 2011. The defendant was ultimately transported to police headquarters.

Approximately 15 to 20 or 20 to 25 minutes after the original dispatch call, Detective David Nieves responded to the location of the Dunkin' Donuts and began ... an investigation of the 7-Eleven robbery. He was told upon arrival at the scene that one of the other officers, specifically Officer Jackson, had seen a gun in a trash can inside the bathroom. Detective Nieves recovered that firearm. It was, in fact, a nine-millimeter Taurus semi-automatic handgun. It was loaded with live rounds. There were nine in the magazine. The handgun was photographed and was ultimately tested and determined to be operable as part of the police investigation.

Detective Nieves also took into his possession $615 which was the cash that was on the defendant's person and he also took into possession a $20 bill from the clerk of the Dunkin' Donuts where the defendant had purchased a cup od coffee. The money that was taken off the defendant's person – all of the money taken off the defendant's person was identified by the 7-Eleven personnel as money that was taken from the 7-Eleven robbery immediately prior to the defendant's detention.

After Detective Nieves left the Dunkin' Donuts, after he concluded his investigation police work there, he went to 7-Eleven to advise either store personnel or police personnel that he was going to require surveillance tapes and ultimately returned to headquarters where he spoke to the defendant.

The interview with the defendant occurred in the conference room library area of the police department. The interview occurred at a table which was described as eight-foot-by-14-foot. The defendant was brought into that location from the booking area of Bensalem Township Police Department. The interview began shortly before 8 o'clock. Detective Nieves noted at the time of the interview that the defendant was wearing the dark clothes that had been described by police dispatch.

An interview was ultimately conducted. Detective Nieves testified and I find as fact that he read the Miranda Warnings from the Miranda card that's provided to officers in Bensalem Township Police Department, that he read those rights to the defendant, that the defendant indicated he was willing to speak to the

police officer or to the detective without an attorney being present. The card was then provided to the defendant to review and the defendant was asked to sign that card. The Miranda card marked as CS-2 and made part of this record contains the responses of the defendant that he understood his rights and that he was willing to speak to the police without an attorney being present and it contains the initials of the defendant.

Initially the defendant indicated that another individual by the name of Mark was the individual who committed the crimes in question, but ultimately after police questioned the defendant, [he] noted that he was, in fact, the individual who engaged in the robbery of the 7-Eleven on January 29th, 2011.

I would note that the - and find as fact that the robbery that occurred at the 7-Eleven was reported to police radio, specifically 9-1-1, by an employee of the 7-Eleven, that at the time the employee was on the phone and provided specific information as to what had occurred at the 7-Eleven, but that information was also supplemented by another individual who was placed on the telephone with 9-1-1, that individual was the person who entered the 7-Eleven as the defendant was leaving the 7-Eleven following the robbery. Together the information provided by those two individuals clearly established that the individual who had committed the robbery was a black male, that he was thin, approximately five-foot-ten, black jacket, [black] hooded sweat shirt and jeans. There was also information provided by the store clerk, the witness at the 7-Eleven, that was employed by 7-Eleven, that the defendant was in possession of a handgun. There are two separate responses to that same question and in one response the employee said there was a handgun and in another response it appears he said there was not a handgun, so at that point there was some confusion as to whether or not the defendant was armed.

\*\*\*

The basis of the motion here was that the defendant was under arrest at the time ... that he was removed from the bathroom at the Dunkin' Donuts and that, therefore, that the arrest was not supported by probable cause and, therefore, all of the evidence that was seized from the defendant, including money from the defendant's pocket, or any other evidence that was taken from him, or the statement that was taken from him by Detective Nieves, that all of that would be fruit of the illegal arrest and should be suppressed. ...

The Commonwealth has argued that this is an investigatory detention. The defense has argued there was an arrest. I find that under either case, whether or not you consider it an investigatory detention, where the police would be required to have articulable facts that criminal activity was occurring, or whether or not it was an arrest where the police would be required to have probable cause, in this case I find that ... the police did have specific articulable facts to support an investigatory detention and I find the police did have probable cause to arrest the defendant.

This is probably about the strongest case of probable cause that I've seen in a while. ...

\*\*\*

8

So, in any event, whether it was an arrest or whether it was an investigatory detention, the police clearly have sufficient information to act the way that they did and acted appropriately, so based on that I find that the Motion for Suppression is not warranted and the Motion is denied.

N.T. August 30, 2011, pp. 71-84.

At Tate's stipulated waiver trial, held on March 6, 2012, the following evidence, findings of fact and verdict were placed of record:

Initially, this Court addressed Tate's pre-trial Motion to Suppress the Statements made to Detective Nieves on January 29, 2011, the date of his detention. According to Tate, his statements should have been suppressed because he did not knowingly, intelligently or voluntarily waive his Miranda rights due to his alleged state of intoxication that resulted from smoking "dust" earlier in the day.

Tate, testifying on his own behalf, recalled meeting Detective Nieves on January 29, 2011. He did not recall whether he was given the Miranda card to sign before or after speaking with Detective Nieves, but did acknowledge reading and indicating that he understood the contents of that card. Tate stated that he was "pretty high" at that time because he had smoked "dust" earlier in the day, around 3:00 or 4:00 p.m., and "the dust high lasts for like three or four hours." N.T. March 6, 2012, pp. 53-56.

Upon cross-examination, Tate admitted that he recognized the yellow Miranda card with his signature, date (1/29/11), and time (7:50 p.m.). He acknowledged that he had been alone with Detective Nieves, who was dressed in plain clothes, in the police station conference room. He admitted that Detective Nieves had asked him questions in an unthreatening manner and did not yell or act aggressive, and he acknowledged providing Detective Nieves with information including his address, telephone numbers, social security number and educational background. N.T. March 6, 2012, pp. 57-62.

Tate stated that he "smoke[s] a lot of dust," and explained that "dust," also referred to as "wet," is "mint leaves dipped in embalming fluid, and it's cut with ... jet fuel. It's worse than ... angel dust." He recalled smoking dust with his friend, Nick, at Nick's house in Philadelphia, and then driving in a truck with Nick and two girls to the Parx Casino on Street Road. Tate stated that he does not gamble but recalled having more than $20 and less than $100 in his pocket that night. Tate said he did not recall going into the 7-Eleven or Dunkin' Donuts shops across the street. N.T. March 6, 2012, pp. 62-69.

Detective Nieves testified that upon meeting with Tate, he first advised him of his Miranda rights. Detective Nieves read each right to Tate verbatim from the Miranda card, and after Tate acknowledged his understanding, Detective Nieves marked that item on the card with a "Y" to indicate "yes." Tate then reviewed and signed the card acknowledging his consent to the responses indicated on the card. After that, Detective Nieves interviewed Tate, and at the conclusion of the interview he asked Tate if he wanted to provide his own written statement which Tate declined to do. He said Tate appeared normal, coherent and understanding during the interview. N.T. March 6, 2012, pp. 71-79.

At the conclusion of this testimony, we denied Tate's Motion to Suppress and placed our reasons of record:

> With respect to the Miranda warnings and motion that was filed in connection therewith, I find that on January 29, 2011, during the evening hours subsequent to a dispatch that was issued in response to a report of a robbery at the 7-Eleven in Bensalem Township, Detective Nieves came into contact with the defendant at the Bensalem Township Police Department. Detective Nieves was dressed in civilian clothes, met with the defendant in a conference room with only the defendant and the detective present at the time.
>
> The detective discussed general matters with the defendant. The discussions were nonthreatening and nonaggressive and were conducted in normal conversational tones. The detective did not observe any signs of incoherence, confusion, or anything that would lead the detective to believe that the defendant was either under the influence of drugs or in any other way unable

10

to comprehend the discussions. There was an exchange of information regarding general topics of name, address, social security numbers and other specific general information that was not related to the offense. The detective did not raise any question regarding the offense until the yellow Miranda warning card was read to the defendant.

The detective asked if the defendant understood each paragraph and, upon receiving an affirmative response, checked off the paragraph by writing the letter "Y" for yes that the defendant understood that paragraph. Each of the paragraphs on the yellow Miranda card were marked with the letter "Y" after the detective read each paragraph to the defendant.

The defendant was also given the opportunity to read the card, and the detective observed the defendant appearing to read the card and, when asked, the defendant signed the card evidencing his understanding of the contents therein.

The defendant asserts that he was smoking a drug called dust starting at 3:00 to 4:00 p.m. that afternoon. He also stated that he smokes dust on a very regular basis. He asserts that he was under the influence of dust at the time that the interview took place. However, the defendant was able to testify in court today about detailed information, about his whereabouts on that day subsequent to 3:00 to 4:00 in the afternoon or subsequent to the time that the defendant asserts he had smoked the drugs.

The defendant was able to testify about his itinerary for the evening in detail and to testify about the details of the interview that was conducted by the detective.

It is the finding of the Court that the defendant understood the warnings that were given to him by the detective, voluntarily signed the card evidencing his understanding, and the Court finds that all statements that related to the offense were obtained subsequent to the reading and appropriate presentation of the contents of the card to the defendant.

I find the detective's testimony to be credible and find that there was no coercion that was utilized to cause the defendant to sign the Miranda card, and for those reasons, conclude that the defendant's motion to suppress the statements given to the Miranda warnings are unfounded and the motion is denied.

N.T. March 6, 2012, pp. 98-101.

Next, a colloquy was conducted with Tate, in accordance with Pa.R.Crim.Proc. Rule 620, which ascertained that he understood the essential ingredients of a jury trial and that his waiver of a jury trial was knowing and intelligent. N.T. March 6, 2012, pp. 116-120.

The Commonwealth and defense counsel then stipulated to the incorporation of the record from the Suppression Hearing held before Judge Gibbons on August 30, 2011, and the

11

Commonwealth placed of record the evidence it would have presented if a trial by jury had been held. N.T. March 6, 2012, pp. 121-143.

After the Commonwealth rested, this Court entertained argument, including that of both Tate and his defense counsel, and then we entered the following findings of fact and verdict:

On January 29, 2011, at about 6:00 p.m., an individual entered the 7-Eleven store at Street Road and Windsor Street and brandished a black handgun pointing it at the store clerk; one, Badr Toughzaoui. The individual demanded money which was handed over by the clerk. The clerk handed over $250 that was handed in a packet and wrapper. He also handed over $50 that was handed in a wrapper and some loose currency, the total amount of which was $635.

The clerk was also directed to hand over cigarettes which were placed in a plastic bag and handed to the individual.

The individual who entered the store was wearing a black leather jacket with a black knit cap and a black or dark hoodie sweatshirt and, possibly, other layers of clothing. The clerk, after handing over the items, and the individual having left the 7-Eleven store, then called 911 giving a description of the person as has already been noted. There was a second phone call by another employee in the store, a Mr. or Mrs. Patel. This 911 call resulted in a dispatch to the Bensalem Township Police, and that dispatch was received by an Officer Steven Bailey who was in close proximity to the 7-Eleven. Officer Bailey received that call at approximately 6:04 p.m.

The caller from the 7-Eleven indicated that they believed the individual had run across Street Road to a Dunkin' Donuts store. Officer Bailey responded within minutes to that store and was able to observe a black male dressed as noted in the 911 call.

The officer awaited the arrival of three other officers, Officer Gregory Jackson, Joseph Gansky, and Alan Wolfinger. All four proceeded into the Dunkin' Donuts and went to the area where ... Officer Bailey observed the individual who retreated to the rear of the Dunkin' Donuts to the area of the bathroom. The officers ordered the individual in the bathroom to exit, the individual failed to do so, and after several attempts to have the person exit, one of the officers opened the door and found the defendant standing in the four-by-four bathroom, and the defendant continued to refuse to exit. The officers entered the bathroom. A struggle ensued and the defendant was successfully removed from the bathroom. The arresting officer, Officer Bailey, noticed currency in the defendant's pocket. The amount of funds was $615. The defendant as identified by the store clerk in Dunkin' Donuts had purchased a cup of coffee for $20. The $20 was retrieved and the total amount that was confiscated by the police officer was $635, which was the exact amount that the 7-Eleven clerk indicated was taken from the store.

Those funds were returned by the officer.

12

The officers discovered a 9 millimeter black handgun in the waste basket in the bathroom.

The clerk from the 7-Eleven was brought over to the Dunkin' Donuts and identified the defendant to the extent that identification could be made by clothing; although, the clerk would not have been able to identify - fully identify the facial features of the defendant.

The gun that was retrieved was swabbed for DNA testing. The defendant provided a DNA sample. Testing was done and a match was achieved. The defendant gave a statement to the police officer following his having been given his Miranda warnings and admitted his involvement in the robbery.

The store clerk at the 7-Eleven was placed in fear of death or serious bodily injury by virtue of the handgun being pointed directly at the clerk at the time of the demand for the funds and cigarettes.

The defendant has been convicted of three prior offenses for possession with intent to deliver a controlled substance.

Base on those facts as found, the Commonwealth has proven beyond a reasonable doubt that a theft had occurred and that theft was of currency and cigarettes. And, in the course of committing the theft, the defendant threatened the store clerk with -- threatening to shoot the clerk -- and that satisfies the elements of robbery under 18 Pa.C.S.A. § 3701 (a)(1)(ii). Those facts also prove all the elements of receiving stolen property under the Crimes Code at Section 3925(a).

The facts as found also satisfies all of the elements of the offense of firearms not to be carried without a license. And I should state that the Commonwealth has proven that the defendant did not have a license to carry a firearm by virtue of the statement and certification from the Pennsylvania State Police.

Furthermore, the elements of possession of a weapon under the Crimes Code at Section 907(b), the elements of that offense have been proven beyond a reasonable doubt, recklessly endangering another person under the Crimes Code 2705 by virtue of engagement in reckless conduct placing another in danger of fear or serious bodily injury have been made out along with theft by unlawful taking under ... Section 3921(a) of the Crimes Code; also, possession of a weapon by a person who had previously been convicted of a crime.

Under Section 6105(a)(1), the elements of all of the counts in the information have been proven beyond a reasonable doubt and, therefore, the defendant is found guilty of all seven counts on the Information.

N.T. March 6, 2012, pp. 156-162.

Sentencing was deferred to May 3, 2012, at which time, as noted above, this Court sentenced Tate upon Count 1, Robbery, to pay the costs of prosecution and undergo imprisonment in a State Correctional Facility for not less than seven and a half (7 ½) nor more than seventeen (17) years, and we sentenced Tate upon Count 4, Possession of a Weapon, to

undergo imprisonment in a State Correctional Facility for a concurrent period of not less than one (1) nor more than two (2) years. No further penalties were imposed upon the remaining Counts.

As previously noted, pursuant to this Court's Order of December 3, 2013, Tate's court-appointed appellate counsel filed a "Defendant's Statement Pursuant to Pa.R.App.Pro. 1925(b)" on March 6, 2014. He subsequently replaced that with the "Defendant's Statement Pursuant to Pa.R.App.Pro. 1925(b) Submitted Pursuant to the March 11, 2014 Order of the Superior Court Allowing the Defendant to Submit a Statement Pursuant to Pa.R.App.Pro. 1925(b)," which he filed on March 17, 2014.

In his latest "Statement Pursuant to Pa.R.App.Pro. 1925(b)," Tate argues *verbatim* that:

1. The Defendant is entitled to a new trial because there was neither reasonable suspicion, probable cause nor any other grounds to detain, search, and arrest the Defendant on January 29, 2011 because the description of the perpetrator given to the police who arrested him was not sufficient to allow then [sic] to accost or otherwise detain him, and thus his arrest, the seizure of evidence from him, and the use of other evidence obtained from exploitation of his arrest, including DNA evidence violated the Defendant's rights under U.S. Const. Amend. IV and XIV and Pa. Const. Art. I, § 8.

2. The defendant is entitled to a new trial under U.S. Const. Amend V, VI and XIV and Pa. Const. Art. I. §9, because his waiver of his rights to remain silent was not voluntary due to reduced mental capacity resulting from his ingestion of intoxicating substances prior to his arrest.

3. The evidence was insufficient to convict the Defendant of the charges against him because the [sic] neither the Defendant nor the physical evidence presented against him at trial sufficiently tied him to description of the person who committed the crime.

Defendant's Statement, March 17, 2014.

## DISCUSSION

In his first challenge to his conviction, Tate claims that his arrest was unconstitutional because there was "neither reasonable suspicion, probable cause nor any other grounds to detain,

14

search, and arrest [him] on January 29, 2011." As a result, Tate argues that all evidence obtained

as a result of his arrest should have been suppressed.

The Superior Court of Pennsylvania has consistently recognized that:

[p]robable cause exists where an officer is presented with facts and circumstances which are sufficient to warrant a prudent individual in believing that an offense was committed and that defendant committed it. *Commonwealth v. Dennis*, 417 Pa.Super. 425, 612 A.2d 1014 (1992). In determining whether probable cause existed in a particular situation, "a court will not look just at one or two individual factors, but will consider the 'totality of the circumstances' as they appeared to the arresting officer." *Id.* We also focus on the circumstances as seen through the eyes of a trained officer, taking into consideration that probable cause does not involve certainties, but rather "the factual and practical considerations of everyday life on which reasonable and prudent men act." *Id.* (quoting *Commonwealth v. Simmons*, 295 Pa.Super. 72, 440 A.2d 1228 (1982)); *see also Interest of J.H.*, 424 Pa.Super. 224, 622 A.2d 351 (1993). Finally, our Courts have repeatedly emphasized that determinations of probable cause must be based on a common-sense non-technical analysis. *Id.*

*In Interest of D.W.*, 629 A.2d 1387, 1388 (Pa.Super. 1993).

In a subsequent reaffirmation of this position, the Superior Court reiterated that:

… we note that "[i]n this Commonwealth, the standard for evaluating whether probable cause exists is the 'totality of the circumstances' test set forth in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)." *Commonwealth v. Rodriguez*, 526 Pa. 268, 272, 585 A.2d 988, 990 (1991). "Probable cause exists when the facts and circumstances within the officers' knowledge are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed." *Commonwealth v. Gibson*, 536 Pa. 123, 130, 638 A.2d 203, 206 (1994). "It is only the probability, and not a *prima facie* showing, of criminal activity that is the standard of probable cause for a warrantless arrest." *Commonwealth v. Quiles*, 422 Pa.Super. 153, 167, 619 A.2d 291, 298 (1993) (en banc).

*Commonwealth v. Britt*, 691 A.2d 494, 497 (Pa.Super. 1997).

An examination of the totality of the circumstances surrounding this case reveals that

there was an overwhelming amount of indisputable evidence to support the conclusion that the

police officers clearly had probable cause to detain and arrest Tate, and this claim is meritless.

15

The factual findings as placed of record revealed that the witnesses at the 7-Eleven store resolutely and consistently described the defendant's physical appearance and the type and color of the apparel he was wearing, including the dark-colored hooded sweat shirt and knit cap, as well as the direction the defendant travelled after committing the robbery. The witnesses placed and immediate emergency call to 9-1-1, and Officer Bailey of the Bensalem Township Police Department responded within minutes to the location of the Dunkin' Donuts store where the defendant was seen headed. Officer Bailey and the two other responding police officers observed that the defendant was the only black male in the Dunkin' Donuts store and that he matched the physical description provided by the dispatch call and was wearing the apparel described by the witnesses at the 7-Eleven.

The officers' suspicions were undoubtedly heightened when the defendant refused to comply with their request to exit the bathroom in the Dunkin' Donuts store, and instead chose to engage in a physical struggle with the officers in an attempt to escape. This conduct could reasonably be considered by the officers as a consciousness of guilt and lead them to conclude that the defendant was the perpetrator of the robbery. *See Commonwealth v. Bruce*, 717 A.2d 1033, 1037-1038 (Pa.Super. 1998) ("when a person commits a crime, knows that he is a suspect and conceals himself, [ ] such conduct is evidence of consciousness of guilt, which may form the basis, along with other proof, from which guilt may be inferred).

In addition, while the defendant was being detained, he was observed to be in possession of the exact amount of currency taken from the 7-Eleven store, and a handgun was retrieved from the bathroom wastebasket which was later confirmed to be in the defendant's possession.

While Tate had attempted to argue at his trial that the description of the perpetrator was insufficient to provide probable cause for the police officers to arrest him because his face had

16

been concealed by the hooded sweat shirt and knit cap pulled down to his eyes, this Court had no difficulty in concluding from a review of the totality of the circumstances surrounding the commission of the crimes at the 7-Eleven store on January 29, 2011, that the police officers did have probable cause to arrest him. Consequently, the evidence obtained as a result of his detention should not be suppressed and Tate's assertion of error has no merit.

Tate next claims that his waiver of his rights to remain silent before speaking with Detective Nieves was not voluntary due to reduced mental capacity resulting from his ingestion of intoxicating substances. According to Tate, at the time of his interview with Detective Nieves at the Bensalem Township Police Department conference room, he was "pretty high" from "smoking dust" approximately four hours earlier.

In *Commonwealth v. Manning*, 435 A.2d 1207, 1209 - 1210 (Pa. 1981), the Supreme Court of Pennsylvania addressed an appellant's similar argument that "the trial court erred in refusing to suppress incriminating statements made to the state police shortly after his arrest on the grounds that he was incapable of knowingly, voluntarily and intelligently waiving his Miranda [FN3] rights." The Court noted that:

> Appellant maintains that the ingestion of a large quantity of drugs prior to the shootings so mentally and physically debilitated him that he was unable to effect a valid waiver of his constitutional rights. We do not agree.
>
> FN3. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
>
> '(I)ntoxication is a factor to be considered, but it is not sufficient, in and of itself to render the confession involuntary.' *Commonwealth v. Jones*, 457 Pa. 423, 432-33, 322 A.2d 119, 125 (1974). The test is whether there was sufficient mental capacity for the defendant to know what he was saying and to have voluntarily intended to say it. *Commonwealth v. Smith*, 447 Pa. 457, 460, 291 A.2d 103, 105 (1972). We believe this standard is equally applicable to those instances where an accused was allegedly under the influence of drugs or narcotics at the time of his interrogation by police officials.

17

*Commonwealth v. Culberson,* 467 Pa. 424, 427-28, 358 A.2d 416, 417 (1976). Moreover, it is well-established that

'(t)he burden to prove a valid waiver by a preponderance of the evidence is upon the Commonwealth ... and our responsibility upon review is to determine whether the record supports the factual findings of the court below and the legitimacy of the inferences and legal conclusions drawn from those findings.... In making this determination, we are to consider only the evidence of the prosecution's witnesses and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted.'

*Commonwealth v. Firth,* 479 Pa. 333, 337, 388 A.2d 683, 685 (1978) *(quoting Commonwealth v. Goodwin,* 460 Pa. 516, 522-23, 333 A.2d 892, 895 (1975) (citations omitted)).

*Manning,* 435 A.2d at 1209 – 1210.

The *Manning* Court observed that "[a] careful review of the suppression record reveals that while appellant appeared disheveled and emotionally upset during the interrogation, there is evidence that he was not so intoxicated by drugs or alcohol as to not understand and voluntarily waive his Miranda rights." The Court further observed that the police officers "who took appellant into custody testified that appellant was alert, coherent, responsive to questions and did not appear to be under the influence of drugs or alcohol." The *Manning* Court therefore concluded that "appellant had sufficient mental capacity to voluntarily waive his right to remain silent" and "the lower court did not err in refusing to suppress appellant's statements." *Id.*

In the instant matter, there was no indication to any of the police officers involved that Tate was under the influence of drugs or narcotic substances. Detective Nieves testified that Tate "appeared normal" and "seemed coherent [and] understanding" during the interview, and he had no difficulty in communicating with him. We also observed that while Tate testified that he smoked "dust" approximately four hours prior to the interview, which would suggest a sufficient amount of time had elapsed for attenuation of the effects of the "dust," Tate nonetheless was able to provide and recite with particular specificity information regarding his personal identification.

18

This information included knowledge of his birthdate, address, multiple telephone numbers, social security number and educational history. In addition, after reviewing the Miranda card with his indicated responses to each item, Tate was coherent enough to affix his signature acknowledging his consent to those indicated responses, and he was sufficiently aware of his situation to refuse to provide any written statement to the police upon the conclusion of his interview.

Because the evidence presented at Tate's Suppression Hearing and trial revealed that he did not appear to be under the influence of drugs and was alert, coherent, and responsive to questions at the time of his detention and subsequent interview, this Court easily concluded that Tate "had sufficient mental capacity to voluntarily waive his right to remain silent." Tate's claim in this instance also has no merit.

In his last challenge, Tate broadly claims that the evidence was insufficient to convict him of the charges. This claim is apparently predicated upon his insistence that the physical description of the perpetrator of the 7-Eleven robbery furnished by the witnesses at the 7-Eleven store did not exactly match his physical appearance or the clothes he was wearing, and therefore, he could not be the perpetrator. This claim is essentially a reformulation of his first claim in which he argued that the police officers did not have probable cause for his arrest "because the description of the perpetrator given to the police who arrested him was not sufficient to allow them to accost or otherwise detain him."

In responding to a claim alleging insufficiency of the evidence, the Superior Court of Pennsylvania has consistently stated that:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not

weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Knox*, 50 A.3d 749, 754 (Pa.Super. 2012) (*citing Commonwealth v. Brown*, 23 A.3d 544, 559-60 (Pa.Super.2011) ( *en banc* )).

In the case *sub judice*, we observed that during the closing arguments of his trial, Tate seized upon specific portions of the witnesses' testimony from his preliminary hearing to attempt to cast doubt upon the overwhelming evidence that ultimately resulted in his conviction. According to Tate, inconsistencies in the information provided at the preliminary hearing by the witnesses concerning his physical identification and their inability to identify him due to his concealed face at the time of the robbery provided the necessary substantive evidence proving that he was not the actual perpetrator.

We are cognizant, however, and Tate conveniently neglects to acknowledge, that a language barrier potentially existed at the time of the robbery for the 7-Eleven store employees, Badr Toughzaoui and the Patels, which would account for any alleged discrepancy in their testimony. Tate's argument also does nothing to dispel the fact that he was positively identified by the store clerk after Tate was apprehended by the police, and he fails to acknowledge that his guilt may also be proven wholly by circumstantial evidence. *See Commonwealth v. Chambers*, 599 A.2d 630, 635 (Pa. 1992) ("circumstantial evidence is sufficient to sustain a conviction so long as the combination of the evidence links the accused to the crime beyond a reasonable

doubt" and that circumstantial evidence "can be as reliable and persuasive as eyewitness testimony and may be of sufficient quantity and quality to establish guilt beyond a reasonable doubt")

Such circumstantial evidence in this case included the descriptions provided by the 7-Eleven store clerks to the emergency call dispatch operator that the perpetrator was a black male wearing a dark-colored knit cap and a hooded sweat shirt under a black leather jacket at the time of the robbery, and the police observations that Tate was wearing a black leather jacket, a dark-colored hooded sweat shirt and a knit cap when he was apprehended. In addition, Tate was indisputably in possession of the exact amount of money taken from the 7-Eleven store during the robbery, and the handgun retrieved from the wastebasket in the bathroom where Tate was apprehended was determined to contain his DNA.

As we noted at the conclusion of his trial, Tate's argument that he could not be convicted of the charges due to the store clerk's inability to specifically identify his face or physical features because he wore a mask leads to the unreasonable conclusion that anyone who wore a mask while committing a crime would be prohibited from ever being convicted of that crime.

Based upon the totality of the circumstances, the credibility of the witnesses and the evidence presented at Tate's Suppression Hearing and waiver trial, this Court was convinced beyond a reasonable doubt that Tate was indeed the perpetrator of the robbery and the associated crimes that occurred at the 7-Eleven store on the evening of January 29, 2011.

Furthermore, having rejected Tate's argument that the witnesses' inability to specifically identify him suggests that he is innocent, we are satisfied that the Commonwealth has sustained its burden of proving beyond a reasonable doubt every other element of the crimes with which he was charged.

21

The specific charges for which Tate was tried are defined as follows:

## § 3701. Robbery

(a) Offense defined.—

(1) A person is guilty of robbery if, in the course of committing a theft, he:

(ii) threatens another with or intentionally puts him in fear of immediate serious bodily injury;

18 Pa.C.S.A. § 3701 (a)(1)(ii).

## § 3925. Receiving stolen property

(a) Offense defined.—A person is guilty of theft if he intentionally receives, retains, or disposes of movable property of another knowing that it has been stolen, or believing that it has probably been stolen, unless the property is received, retained, or disposed with intent to restore it to the owner.

18 Pa.C.S.A. § 3925(a).

## § 2705. Recklessly endangering another person

A person commits a misdemeanor of the second degree if he recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury.

18 Pa.C.S.A. § 2705.

## § 3921. Theft by unlawful taking or disposition

(a) Movable property.—A person is guilty of theft if he unlawfully takes, or exercises unlawful control over, movable property of another with intent to deprive him thereof.

18 Pa.C.S.A. § 3921(a).

## § 6106. Firearms not to be carried without a license

(a) Offense defined.--

(1) Except as provided in paragraph (2), any person who carries a firearm in any vehicle or any person who carries a firearm concealed on or about his person, except in his place

22

of abode or fixed place of business, without a valid and lawfully issued license under this chapter commits a felony of the third degree.

18 Pa.C.S.A. § 6106(a)(1).


### § 907. Possessing Instruments of crime

(b) Possession of weapon.--A person commits a misdemeanor of the first degree if he possesses a firearm or other weapon concealed upon his person with intent to employ it criminally.

18 Pa.C.S.A. § 907(b).


### § 6105. Persons not to possess, use, manufacture, control, sell or transfer firearms

(a) Offense defined.--

(1) A person who has been convicted of an offense enumerated in subsection (b), within or without this Commonwealth, regardless of the length of sentence or whose conduct meets the criteria in subsection (c) shall not possess, use, control, sell, transfer or manufacture or obtain a license to possess, use, control, sell, transfer or manufacture a firearm in this Commonwealth.

18 Pa.C.S.A. § 6105(a)(1).


As noted at the end of the trial, this Court determined that the Commonwealth had proven beyond a reasonable doubt that a theft of currency and cigarettes from the 7-Eleven store had occurred, that in the course of committing that theft, Tate had threatened to shoot the store clerk by displaying a handgun, and that the handgun that had been retrieved from the Dunkin' Donuts' bathroom had been in Tate's possession. Those elements satisfied the statutory definition of Robbery, Receiving Stolen Property, Theft by Unlawful Taking, Recklessly Endangering Another Person, and Possession of an Instrument of Crime. The Commonwealth also presented uncontested evidence, by virtue of certified Pennsylvania State Police records, that revealed Tate did not possess a license to carry a handgun, and that his previous criminal convictions

23

prohibited him from owning or possessing a firearm, thus satisfying the requirements necessary to find Tate guilty of the charges of Firearms Not to be carried Without a License and Persons Not to Possess Firearms. As a result of these determinations, it was clear that there was sufficient evidence to convict Tate upon each of the charges and we find Tate's last challenge to his conviction and sentence to also be meritless.

## CONCLUSION

For the foregoing reasons, we recommend that this appeal be denied.

BY THE COURT:

DATE: _April 14, 2014_

_____
CLYDE W. WAITE, J.

24